## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RANDOLPH J. YOUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 13 C 8929** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Maria Valdez** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Randolph Young's claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Plaintiff's motion to reverse the Commissioner's decision [Doc. No. 16] is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment [Doc. No. 27] is denied.

## BACKGROUND

### I. PROCEDURAL HISTORY

On April 21, 2011, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability since October 5, 2009, due to arthritis and degenerative joint disease in his lumbar and cervical spine. Plaintiff's claim was denied initially and upon reconsideration, and he then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 24, 2012. Plaintiff

appeared and testified at the hearing and was represented by counsel. Medical expert Dr. Ashok Jilhewar and vocational expert James Breen also testified.

On July 21, 2012, the ALJ denied Plaintiff's claim for Disability Insurance Benefits, finding him not disabled under the Social Security Act. The ALJ determined that, despite his back and neck impairments, Plaintiff could perform a limited range of sedentary work, which allowed him to do his past work as a loan officer. The Social Security Administration Appeals Council then denied Claimant's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND[1]

### A.    <u>Background</u>

Plaintiff was born on January 28, 1955 and was fifty-seven years old at the time of the ALJ's decision. Plaintiff's insured status expired December 31, 2014, and so he must establish he was disabled by that date in order to receive benefits. Plaintiff has a long and fairly steady work history going back to 1972.  (R. 169-170.) He's held a number of different jobs in his life, last working as a loan officer from March to July in 2009. (R. 192.)

### B.    <u>Medical Evidence</u>

Plaintiff has an extensive history of treatment of the arthritic and degenerative problems with his back and neck. His troubles began with his neck. In 2001, he had a cervical spine fusion from C2 to C6, and has had three more surgical

---

[1]  The following facts from the parties' briefs are undisputed unless otherwise noted.

procedures done on his neck since then. (R. 266, 288, 309.) His lumbar spine is a problem area as well, as a number of studies have confirmed, beginning with an MRI done on February 27, 2008, which showed degenerative changes throughout, small disc herniation at L4-5, severe disc space narrowing at L5-S1, and disc space narrowing at T-12-L2. (R. 273.) Another MRI on October 30, 2008, showed mild disc space narrowing, disc dessication, and a mildly bulging disc at L1-L2; moderate disc space narrowing and disc dessication, and concentric bulging with left side herniation at L4-5, along with mild encroachment on the neural foramen; and disc space narrowing, disc dessication, and concentric disc bulging at L5-S1, along with modic type 2 endplate changes and bilateral compromise of the neural forami. (R. 282.) X-rays taken August 11, 2009, revealed decreased disc height and spurring throughout Plaintiff's lumbar spine, as well as facet hypertrophy at L4-5 and L5-S1, and mild listhesis of L4 on L5. (R. 269.)

On October 6, 2009, Plaintiff saw Dr. Thomas McNally, seeking treatment– possibly surgical – for his low back pain. (R. 273.) Physical exam was essentially normal in terms of range of motion and motor strength. (R. 272.) At that time, Plaintiff was taking Meloxicam, Naproxen, and Tylenol. (R. 271.) Dr. McNally noted that Plaintiff's complaints of low back pain over the previous two years were consistent with results from previous x-rays and MRIs. (R. 273.) The doctor pointed out the major risks and lack of guarantees associated with lumbar fusion surgery. (R. 273.) Another MRI would be performed before any decisions would be made. (R. 274.)

That study, done on October 15, 2009, revealed moderate degenerative changes at L5-S1, along with a central disc bulge possibly causing stenosis, with slight S1 nerve root displacement. There was also disc space narrowing in the lower thoracic spine, and mild facet arthropathy at L4-S1. (R. 263-264.) When Plaintiff went back to see Dr. McNally to discuss the results on November 12, 2009, he was complaining of increased low back pain, and left leg and foot pain. (R. 275.) He was moving slowly and carefully around the room, and his gait was antalgic. (R. 276.) Dr. McNally again went over the risks of various possible surgical interventions. (R. 277-278.)

In April 2010, after receiving two epidural steroid injections in the previous four months, Plaintiff saw Dr. Anthony Savino for a follow-up on his back and leg pain. (R. 293.) Plaintiff had gotten some relief with the injections. (R. 293.) Reflexes were symmetrical and straight leg raising was negative bilaterally. (R. 293.) Dr. Savino ordered a CT scan and myelogram of Plaintiff's lumber spine. (R. 293.)

The studies were done shortly thereafter. On April 29, 2010, the CT scan showed degenerative changes throughout, with mild disc space narrowing at L3-4; mildly decreased disc height, mild to moderate disc protrusion, mild stenosis, and moderate to severe neural foraminal narrowing at L4-5; and moderate to severe disc space narrowing, mild osteophyte formation, and moderate to severe neural foraminal narrowing at L5-S1. (R. 285.) The myelogram was positive for impression on the thecal sac. (R. 286.) When Plaintiff returned to Dr. Savino on May 3, 2010, the doctor explained that surgery would not alleviate his back pain – he would have to live with that.  Surgery could only address his left leg pain. (R.292.)

Plaintiff began suffering from left shoulder pain in the summer of 2010. On September 1, 2010, Plaintiff sought treatment from Dr. Joshua Alpert. (R. 290.) Examination revealed moderate pain in the AC joint at the top of the shoulder, and Speed's and Yergason's testing were positive. (R. 290.) X-rays confirmed AC joint arthropathy. (R. 290.) Dr. Alpert diagnosed a rotator cuff tear, along with AC joint arthritis and biceps tendonitis. (R. 290.)

Subsequent MRI of Plaintiff's left shoulder showed rotator cuff tenopathy and inflamed bursa. (R. 289.) When Plaintiff returned to Dr. Alpert on September 8, he exhibited a full painless range of motion in the left shoulder, but did have pain in the AC joint and biceps. (R. 289.) Dr. Alpert administered a Lidocaine injection and sent Plaintiff home with instructions on home exercises. (R. 289.)

Plaintiff returned on October 20, 2010, saying his shoulder had improved, but he still had pain and was now experiencing numbness down his arm. (R. 288.) Examination of the shoulder was essentially normal and Dr. Alpert felt the problem might be stemming from Plaintiff's cervical spine. (R. 288.) Plaintiff was noted to be experiencing financial difficulties which might adversely affect future treatment and testing. (R. 288.)

On March 31, 2011, the state disability agency arranged for Dr. Roopa Karri to examine Plaintiff, in connection with his application for disability benefits. Plaintiff told Dr. Karri that he had back pain and pain radiating to his left leg and foot, with occasional numbness in his left foot. For the previous six months, Plaintiff had been using a cane. (R. 309.) Dr. Karri noted that Plaintiff walked with a small-stepped gait, limping on the left leg. (R. 310.) Plaintiff could not heel/toe walk,

squat, or walk with a tandem gait, and he could not walk fifty feet without his cane. (R. 310.) Straight leg raising was negative. Strength was 5/5 in the upper and lower extremities, and deep tendon reflexes were 2+ in the biceps, triceps, knees, and ankles. Lumbar spine flexion was 70/90 degrees; cervical spine flexion was 30/80 degrees. (R. 310.) There was decreased sensation to pinprick in Plaintiff's left foot. (R. 310.)

On April 8, 2011, Plaintiff began seeing Dr. David Norbeck for his low back pain. Dr. Norbeck noted that straight leg raising was positive at 80 degrees, and that lumbar spine flexion was 80/90 degrees. (R. 321.) Motor strength and sensation were normal. (R. 321.) On May 3, Dr. David Schneider gave Plaintiff an epidural injection at L5. (R. 322). He was treated without charge as he had no insurance. (R. 331.) He needed another injection by October of 2011, but this time it would not be free; he would have to pay $500. (R. 331.) Plaintiff was hesitant, but went ahead with the procedure on October 25, 2011. (R. 333.) He followed up with Dr. Schneider on November 14, 2011. Neurological exam was normal with the exception of decreased sensation in the left foot. (R. 335.) Straight leg raising was positive at 30 degrees. (R. 335.) The doctor noted that any surgery would be elective as Plaintiff had "no gross deficit." (R. 335.) By that time, Plaintiff was taking Tylenol, Aleve, and Norco, but the medications were not very effective. (R. 337.)

On April 13, 2011, Dr. Henry Rohs reviewed Plaintiff's medical file for the agency. He thought that Plaintiff could lift ten pounds frequently, and less than ten pounds occasionally. (R. 314.) He could stand or walk for at least two hours out of every workday but needed a cane to do so. He could sit about six hours out of every

workday. (R. 314.) Dr. Rohs said Plaintiff could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; he could never climb ladders, ropes, or scaffolds. (R. 315.) Dr. Charles Kenny then reviewed the file on July 12, 2011, and concurred with Dr. Rohs' opinion. (R. 325.)

### C. The Administrative Hearing

#### 1. Medical Expert's Testimony

The administrative hearing began with Dr. Ashok Jilhewar testifying as a medical expert. He reviewed the medical evidence and summarized it at length at the hearing. (R. 28-36.) The ALJ asked Dr. Jilhewar whether Plaintiff's impairments, individually or in combination, met or equaled an impairment listed as presumptively disabling in the Commissioner's regulations. Dr. Jilhewar said that the Plaintiff's condition did not meet listing 1.04(A) because there was an "absence of neurological deficit in dermatomal distribution." (R. 36.) The doctor went on to testify that Plaintiff would be limited to sedentary work, using an assistive device. Dr. Jilhewar thought Plaintiff could lift ten pounds occasionally and frequently, and sit for two hours at one time and a total of eight hours in an eight-hour workday. (R. 37.) Dr. Jilhewar said he "would assert there was a medical necessity of sit and stand option at will," but he could not "state that because of the extensive treatment records not documenting the involvement either of the left hip or of the left sacroiliar joint, except for a one-time examination by the consultative examiner . . . ." (R. 37.) According to the doctor, there were no medical records to suggest Plaintiff needed a sit-stand option. (R. 37.) Dr. Jilhewar did allow that Plaintiff would need the use of a cane to walk more than fifty feet, and said Plaintiff

could stand or walk thirty minutes at a time with a cane and a total of two hours in an eight-hour workday. (R. 37.) Dr. Jilhewar added that Plaintiff could use ramps frequently, stairs occasionally, and could balance and stoop occasionally. He could never climb ladders, ropes, or scaffolds, and never kneel, crouch, or crawl. (R. 38.) Dr. Jilhewar did not think there was medical evidence to support any reaching limitations concerning Plaintiff's left shoulder. (R. 38, 40.) Due to his need for a cane, Plaintiff could not work at unprotected heights or around dangerous machinery. (R. 38.)

When questioned by Plaintiff's attorney, Dr. Jilhewar testified that he did not see any evidence of persistent muscle spasm or specific neurological abnormality. (R. 42.) Plaintiff's complaints of pain, however, were consistent with the radiological findings. (R. 42.) There was displacement of the S1 nerve and neural foraminal stenosis at multiple levels, both of which could cause pain. (R. 42.)

### 2.    *Plaintiff's Testimony*

Plaintiff testified that he was right-handed, had a high-school education, and lived in a single-family home with his wife. (R. 43-44.) He last worked in 2009 for a bank. (R. 44.) It was a desk job in the loan processing department. (R. 45.) Plaintiff said that he was fired from that job because of "something maybe [he] said." (R. 46.) He lost his previous job at another bank when the bank changed hands and there were layoffs. (R. 46.) He wasn't able to lift anything at these positions due to his back; if he needed to, he would ask for help. (R. 48.) While he was seated most of the day at these jobs, he was able to get up and move around every hour or so. (R. 49, 61.) In addition, his impairments and his medications adversely affected his sleep,

which made it difficult for him to concentrate at work and his performance suffered. (R. 60.) Before that, Plaintiff was doing work that required physical labor, for example, as a technician at a servicing center for recreational vehicles. (R. 50.) Plaintiff told the ALJ that he was still trying to find work. (R. 51.) Over the previous three years, he had two interviews for administrative positions. (R. 51.)

Around the house, Plaintiff tried to do what he could: cooking, washing dishes, and occasionally doing laundry. (R. 52.) He and his wife owned two dogs but he did not walk them. (R. 52.) He could only walk a couple of hundred yards comfortably. (R. 52.) He used a cane most of the time, even around the house. (R. 53.) He had scaled back his hobbies; he did not bowl anymore and rarely fished. (R. 53.) In a typical day, he got up at 7:30 or 8:00 a.m., had some breakfast, checked emails, checked on job openings, and spent a good deal of time watching TV. (R. 54.) He napped in the afternoons. (R. 54-55.) He could not sit or stand for very long, so he spent a lot of time lying down. (R. 62.)

Plaintiff told the ALJ he could walk for about ten minutes, with a cane, before he felt pain. (R. 55.) If he sat for too long, he would have pain. He had pain in his left leg and foot during the hearing. (R. 55.) He needed to change positions from standing to sitting and did so during the hearing. (R. 55, 59, 61.) Plaintiff testified that he took Vicodin or Norco for extreme pain, and Tylenol or ibuprofen the rest of the time. (R. 57, 58.) He did not like the side effects from the Vicodin or Norco, so he tried not to take it more than twice a week. (R. 57.) Plaintiff explained that he hadn't had more recent surgery due to lack of insurance and because he "wasn't up for . . . pins and screws" being put in his back. (R. 58.)

### *3.* *Vocational Expert's Testimony*

Next, the Vocational Expert ("VE") testified, characterizing Plaintiff's past work as ranging from semi-skilled and sedentary (loan officer) to semi-skilled and heavy (RV service technician). (R. 67.) The ALJ asked the VE whether a hypothetical person with the same age, education, and work experience as Plaintiff, and a residual functional capacity ("RFC") to lift up to ten pounds occasionally and frequently, stand or walk for up to two hours a day, and sit for up to eight hours a day, could perform any of Plaintiff's past work. The ALJ added that this hypothetical person could frequently climb ramps, occasionally climb stairs, balance and stoop, but could never climb ladders, ropes, or scaffolds, could never crouch, kneel, or crawl, and could not work at unprotected heights or around dangerous machinery. (R. 67-68.) The VE testified that such a person could perform Plaintiff's past work as a loan officer or administrative assistant. (R. 68.) The ALJ then added the requirement that the individual be allowed to sit and stand alternatively at will, provided this did not take them off task more than ten percent of the time. (R. 69.) The VE responded that the person could still do the loan officer and administrative assistant jobs. (R. 68.) When the ALJ added the restriction that the individual could only occasionally reach overhead, the VE's answer did not change. (R. 69.) But, when the ALJ proposed that, due to pain, the person could only do simple, routine, repetitive tasks, the VE stated that the individual could not perform Plaintiff's past work. (R. 69.) The VE said that his testimony was consistent with the Dictionary of Occupational Titles, except for the sit-stand option, which was not covered in that publication. (R. 70.)

### D.    **ALJ's Decision**

The ALJ followed the familiar five-step process for determining disability. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 5, 2009. At step two, the ALJ concluded that Plaintiff had severe impairments of degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, status post fusion surgery, and degenerative joint disease of the left shoulder.  (R. 13.) But, at step three, the ALJ determined that none of these impairments, alone or in combination, met or medically equaled an impairment list at 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. 14.) The ALJ then determined that Plaintiff retained the RFC to perform sedentary work, lifting up to ten pounds occasionally and frequently, and standing or walking for approximately two hours in an eight-hour workday and sitting for up to eight hours, with the option to alternate between sitting and standing at will, as long as it did not take Plaintiff off task more than ten percent of the time. The ALJ added that Plaintiff could climb ramps frequently, climb stairs occasionally, and balance, stoop, and reach overhead occasionally. Plaintiff could never climb ladders, ropes, or scaffolds, and never crouch, kneel, or crawl. He could not work at unprotected heights, and he had to avoid concentrated exposure to dangerous moving machinery. (R. 14.) At step four, the ALJ found that, given this RFC and the VE's testimony, the Plaintiff could perform his past work as a loan officer or as an administrative assistant. (R. 17.) Accordingly, the ALJ concluded that Plaintiff was not disabled and not entitled to disability insurance benefits under the Social Security Act. (R. 18.)

**<u>DISCUSSION</u>**

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 404.1520(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1–4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence,

shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014); *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility, but neither will the Court act as a "rubber stamp" for the Commissioner. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge between the evidence . . . and his ultimate conclusion . . . ." *O'Connor-Spinner v. Colvin*, – F.3d –, –, 2016 WL 4197915, at *7 (7th Cir. Aug. 9, 2016). The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we

can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham*, 765 F.3d at 698 ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III.   ANALYSIS

Plaintiff challenges the ALJ's decision denying him benefits on three grounds: (1) that the ALJ's determination that Plaintiff's impairments did not meet a listed impairment was perfunctory; (2) that the ALJ failed to provide valid reasons for rejecting Plaintiff's assertions as to his limitations; and (3) that the ALJ's RFC finding was flawed for various reasons.

### A.   <u>The ALJ's Step-Three Determination</u>

At step three, the ALJ determined that Plaintiff did not have an impairment that, either alone or in combination, met or equaled a listed impairment. Under a theory of what the Seventh Circuit calls "presumptive liability," a plaintiff is entitled to benefits if they have a condition that meets or equals an impairment found in the Listing of Impairments. *Kastner v. Astrue*, 697 F.3d 642, 646–47 (7th Cir. 2012). Each listing has a set of criteria which must be met for an impairment to

be deemed conclusively disabling. *Id.* The listing at issue here, §1.04, pertains to disorders of the spine. Like many of the listings, §1.04 is a fairly complex set of symptoms and clinical requirements, which in turn are dependent on an extensive set of definitions and explanations:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> *      *      *
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1. Plaintiff contends that the ALJ failed to consider all the evidence when he found Plaintiff's condition did not meet §1.04(A), and that the ALJ did not even consider whether Plaintiff's condition met §1.04(C).

When determining whether a claimant's impairments meet or equal a listing, "'an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Kastner*, 697 F.3d at 647 (quoting *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004)); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The ALJ also has to consider medical expert opinion. *Barnett*, 381 F.3d at 668. Here, the ALJ mentioned the listing and stated he considered the opinions of

Dr. Jilhewar and the state agency reviewing physicians, but then conclusorily stated that Plaintiff's back impairment did not meet the requirements of subsections A, B, or C of §1.04. (R. 14.) He offered no analysis, perfunctory or otherwise. An ALJ is required to provide a logical bridge from the evidence to his conclusion so that the Court can trace the path of his reasoning and perform a meaningful review of his decision. *See Kastner*, 697 F.3d at 646. The ALJ's step-three finding does not allow for that; there is no explanation of how the ALJ got from the medical record to his conclusion.

As was already suggested, the listing at issue here, like most, can be said to be fairly byzantine. As such, when the ALJ says Plaintiff does not meet it, without more, there is no way to tell why that is. There is no way to tell which requirement, or requirements, the ALJ thought Plaintiff fell short of. Section 1.04(A) begins with the requirement of "nerve root compression characterized by neuroanatomic distribution of pain." There would seem to be evidence of neuroatomic distribution of pain caused by nerve root compression. Plaintiff has pain not only in his lower back, but radiating down his left leg and into his foot. Objective studies, like MRIs and myelograms, have shown evidence of a herniated disc (R.273), bulging discs, encroachment of the neural foramen, compromise of the neural forami (R. 269), nerve root displacement (R. 263), disc bulge with possible stenosis (R. 264), disc protrusion, stenosis, neural foraminal narrowing (R. 286), and impression of the thecal sac. (R. 286.) The next requirement is limitation of motion of the spine, and there would seem to be evidence of that as well. (R. 310, 321.) There also appears to be evidence of motor loss: examination revealed that Plaintiff could not heel/toe

walk or squat. (R. 310); *see Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006)("Inability to squat or to walk on the toes or heels can be evidence of significant motor loss." (citing 20 C.F.R. Part 404, Subpart P, App. 1, 1.00(E)(1)). Plaintiff also had sensory loss in his left foot, (R. 310, 335), and positive straight leg raising, (R. 335). In other words, maybe the Plaintiff's condition does not meet the listing but, looking at the record, that is far from self-evident. The ALJ had to do more than merely say it did not.

As for §1.04(C), Plaintiff incorrectly asserts that the ALJ did not even consider that listing. But while the ALJ at least mentioned it, he again did not discuss it or provide anything more than a conclusory assertion that Plaintiff did not have lumbar spinal stenosis resulting in pseudoclaudication. (R. 14.) As with the ALJ's treatment of §1.04(A), there's no way to assess the ALJ's reasoning here. As just discussed, there is objective evidence of lumbar spinal stenosis. Pseudoclaudication is lower extremity pain caused by spinal, neurological, or orthopedic disorders, http://medical-dictionary. thefreedictionary.com/ pseudoclaudication, so there is evidence of that as well. So the Court is left to guess as to why the ALJ found that Plaintiff does not have lumbar spinal stenosis resulting in pseudoclaudication. The logical bridge requirement demands an answer, *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016), but the ALJ did not provide one.

The Commissioner argues that all the ALJ had to do in this instance was cite the testimony of the medical expert, Dr. Jilhewar, and rely on it. But that's clearly not the case. If it were, the Seventh Circuit would not require consultation of a

medical expert *and* analysis from the ALJ. *Barnett*, 381 F.3d at 668. An ALJ can't

simply defer to the medical expert's conclusion and move on, as the ALJ did here.

Moreover, Dr. Jilhewar's testimony is no more illuminating than the ALJ's

exceedingly brief and conclusory discussion. All the doctor says is that Plaintiff

does not meet §1.04(A) "[b]ecause of the absence of neurological deficit in

dermatomal distribution." (R. 14, 36.) That language is not found in the listing, so

there ought to have been some amplification of that conclusion. Dr. Jilhewar seems

to have taken this from the consultative examiner's report, which he says

characterizes mild weakness in the left lower extremity as not being dermatomal in

distribution. (R. 34.) But the listing speaks of distribution of *pain*, not weakness,

and in any event, the consultative examiner did not say anything about dermatomal

distribution of weakness. (R. 310.) Neither the ALJ's opinion nor Dr. Jilhewar's

testimony explain the basis of Dr. Jilhewar's finding, or indicate how it applies to

§1.04(A).[2]

The Commissioner has something to say about §1.04(C) as well. The

Commissioner submits that Plaintiff has not demonstrated inability to ambulate

effectively as defined by §1.00(B)(2)(b), which §1.04(C) also requires, because

---

[2] Dermatomal distribution refers to the fact that "[a] dermatome is an area of skin in which
the sensory neurons all come from a single nerve. . . ." *Hanson v. Colvin*, 760 F.3d 759,
760–61 (7th Cir. 2014). The dermatomes in the lower extremities are associated with the
lumbar spinal roots. http://medical-dictionary.thefreedictionary.com/dermatomal
+distribution. The spinal roots where the Plaintiff's MRIs and myelogram indicate there are
issues are the ones that affect the leg and foot, which is where the plaintiff experiences pain
and decreased sensation. As such, the question remains why, given the evidence, Dr.
Jilhewar found that Plaintiff did not have dermatomal distribution of neurological deficit.
Given the record, some explanation beyond a bare conclusion was necessary, but, as
indicated above, the question is really academic because §1.04(A) does not talk about
"neurological deficit in dermatomal distribution."

Plaintiff uses a single cane. As noted earlier, however, the listing at issue here is nothing if not convoluted. The "inability to walk without the use of a walker, two crutches, or two canes" is but one example of ineffective ambulation from what §1.00(B)(2)(b) makes clear is a nonexhaustive list. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). More importantly, this reasoning is found nowhere in the ALJ's decision. The Court's review is limited to rationale the ALJ supplies; reasoning that the Commissioner's lawyers come up with later on does not enter into the calculus. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Kastner*, 697 F.3d at 648.

The ALJ failed to build a logical bridge from the evidence to his step-three conclusion. More is required to allow for a meaningful review and that is especially the case here as the listing is rather complicated. This does not necessarily mean that the ALJ's conclusion was wrong. It may well be that Plaintiff's condition does not meet the listings, but the Court cannot simply take the ALJ's word on it. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Accordingly, this matter must be remanded to the Commissioner for further proceedings.

**B.** **The ALJ's Assessment of Plaintiff's Allegations as to his Limitations**

As the ALJ's truncated step-three discussion necessitates a remand, it is unnecessary to address the remaining arguments Plaintiff raises. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). In his attack on the ALJ's RFC determination, Plaintiff takes a blunderbuss approach, failing to concentrate on any one argument point and develop to any extent. Those arguments will not be considered. *See United States v. Stokes*, 726 F.3d 880, 887 (7th Cir. 2013) (criticizing the scattershot approach to brief-writing); *Dynegy Mktg. & Trade v. Multiut Corp.*,

648 F.3d 506, 513 (7th Cir. 2011) ("[T]he 'kitchen sink' approach to briefing cause[s] distraction and confusion, it also consumes space that should be devoted to developing the arguments with some promise."); *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.,* 692 F.3d 507, 509 (6th Cir.2012) ("When a party comes to us with nine grounds for reversing the [lower court's decision], that usually means there are none.").[3] But Plaintiff's arguments regarding the ALJ's assessment of his allegations regarding his limitations are more substantial, and it is worthwhile to address them briefly.

The Social Security Administration recently updated its ruling on how ALJ's should assess a claimant's allegations, replacing Social Security Ruling 96-7p with Social Security Ruling 16-3p. Under the new ruling, ALJs will no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the applicant's] symptoms." SSR 16-3p, 2016 WL 1119029, *2 (Mar. 16, 2016). "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin,* – F.3d –, –,

---

[3] Indeed, it would appear that little thought went into some of these scattershot arguments. For example, Plaintiff complains that the ALJ ignored a report indicating there was a needle stuck in his back. (Pl.'s Mem. at 10.) But that report, done for Dr. Onwuta, (R. 279), coincides with an epidural steroid injection Plaintiff reported receiving from Dr. Onwuta. (R. 195). In all probability, it is nothing more than the injection guidance report for that procedure. *See, e.g.*, http://www.spine-health.com/treatment/injections/ epidural-injection-procedure; *Cf. (*R. 286.) It is highly unlikely, on the other hand, that Plaintiff was walking around with a large needle sticking out of his back and the battery of doctors treating him for back pain did not notice it, despite a number of examinations and MRIs, until December of 2009.

2016 WL 3997246, at *1 (7th Cir. 2016) (emphasis in original). Nothing else has changed, however; an ALJ must still provide good reasons for rejecting a claimant's assertions as to their pain and limitations. SSR 16-3p, 2016 WL 1119029, at *7; *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).[4]

Here, the ALJ offered four reasons for rejecting Plaintiff's allegations as to the degree of limitation he suffered. The ALJ stated that "[t]he objective medical evidence and the claimant's course of treatment do not support the disabling level of limitation alleged . . . ." (R. 15.) The ALJ also pointed out that Plaintiff was looking for work and that he received unemployment benefits in 2011, and that his daily activities suggested the ability to perform sedentary work. (R. 16, 17.)

Basing a rejection of a plaintiff's complaints of pain on the objective medical evidence is a risky proposition in the Seventh Circuit. Time and again, the Court of Appeals has chastised ALJs for relying too heavily on the objective medical evidence in pain cases. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin,* 739 F.3d 1046, 1049–50 (7th Cir.2014); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir.2004). To his credit, the ALJ did go beyond the objective medical evidence but, nevertheless, it is unclear what more in the way of medical evidence the ALJ wanted to confirm Plaintiff's pain. As already discussed, there are numerous studies demonstrating significant issues with the Plaintiff's lower back.

---

[4] As SSR 16-3p is simply a clarification the Administration's interpretation of the existing law, rather than a change to it, the same regulatory factors for evaluating the severity of Plaintiff's symptoms will apply. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016). The result does not change here, however, as the ALJ did not assess Plaintiff's character, just his assertions.

It may be that the ALJ was more focused on the medical treatment than he was on the objective medical evidence. The ALJ felt that Plaintiff's course of treatment – medication and epidural injections – undermined his allegations of disabling pain. (R. 16.) But multiple epidural injections and prescriptions for narcotic pain relievers tend to support claims of pain rather than undermine them. *Stark v. Colvin*, 813 F.3d 684, 687 (7th Cir. 2016); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The record does not paint Plaintiff as one who does not need treatment for pain. *Cf. Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (holding that plaintiff's failure to regularly seek treatment for pain undermined her claims). He returns to doctors again and again. Moreover, he has had four spinal surgeries. Yet, the ALJ was clearly troubled by the fact that Plaintiff chose to forego a fifth spinal surgery. (R. 16, 63-64.) Plaintiff said he just couldn't go through another surgery, especially one that left more hardware in his spine. That's certainly understandable as he had already had a cervical spinal fusion and three other surgeries at that point. The fact that the ALJ used this as a reason for rejecting Plaintiff's allegations regarding his pain is not persuasive.

The ALJ also referenced Plaintiff's daily activities as reason to disbelieve his assertions as to his limitations. He said they "suggest the ability to perform sedentary work consistent with the limitations in his residual functional capacity." (R. 17.) The Court disagrees. An ALJ can look at a plaintiff's daily activities and compare them to their alleged limitations to see if a plaintiff might be exaggerating, but an ALJ can't equate them with work. *Stark*, 813 F.3d at 688; *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010). Doing a few household chores and, as the ALJ

conceded, being able to perform tasks for only short periods of time, like mowing the lawn on a riding mower, does not equate to the ability to hold down a full-time, forty-hour per week job. Plaintiff did not say he was doing housework eight hours a day; he said he spent most of each day lying down and watching TV.

Finally, the ALJ noted that Plaintiff was looking for work and had received unemployment benefits after his alleged onset date. (R.16.) The former really should not be held against Plaintiff. "A disabled person may want to work, may seek work, and in some cases may land work." *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015). "There is no inherent inconsistency in being both employed and disabled. . . . And here, [Plaintiff] was not actually working but merely said that she was looking for work." *Ghiselli v. Colvin*, – F.3d –, –, 2016 WL 4939535, at *5 (7th Cir. Sept. 16, 2016). The latter is a bit more troubling. While the Seventh Circuit has allowed that applying for and receiving unemployment benefits is certainly one factor an ALJ can consider when assessing a plaintiff's allegations, *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005), it has also said that "attributing a lack of credibility to such action is a step that must be taken with significant care and circumspection. All of the surrounding facts must be carefully considered." *Scrogham*, 765 F.3d at 699. On remand, the ALJ should be careful not to veer into an assessment of the Plaintiff's character in this regard. *See* SSR 16-3p, 2016 WL 1020935, *10 ("In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to reverse the Commissioner's final decision [Doc. No. 16] is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment [Doc. No. 27] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**

**ENTERED:**

**DATE:   October 6, 2015**

_____

**HON. MARIA VALDEZ**
**United States Magistrate Judge**